97 P.3d 439

Loren D. BLICKENSTAFF, as
Trustee for M & D Trust,
Plaintiff–Appellant,

v.

Mark CLEGG, individually, G. Matthew
Thomas, individually, and G. Matthew
Thomas, as Trustee for Daniel Thomas
Trust, and T. Steve Joyce, Defendants–
Respondents,

and

Calderwood East, LLC., Defendant.

No. 29907.

Supreme Court of Idaho,
Boise, May 2004 Term.

July 21, 2004.

Rehearing Denied Sept. 7, 2004.

Penland Munther Goodrum, Chtd., Boise, for Appellant. John Courtade and Jay B. Marcus argued.

Wilson & McColl, Chtd., Boise, for Respondent T. Steve Joyce. Brian F. McColl argued.

Strother Law Office, Boise, for Respondent Mark Clegg. Jeffrey A. Strother argued.

Givens Pursley, LLP, Boise, for Respondent G. Matthew Thomas. Thomas E. Dvorak argued.

TROUT, Chief Justice.

Calderwood East, LLC, (Calderwood), owned by Mark Clegg (Clegg) and G. Mathew Thomas (Thomas), acquired Appellant M & D Trust's (M & D) interest in Calderwood in exchange for a note in the amount of $750,000, secured by a deed of trust on Calderwood's property. When the note was not paid, M & D, through its trustee, Dr. Loren Blickenstaff (Blickenstaff), brought eight causes of action against Calderwood, Clegg, Thomas, and the Daniel Thomas Trust (Thomas Trust), for which Thomas is the trustee, and attorney T. Steve Joyce (Joyce). The district court granted summary judgment in favor of Thomas and Joyce as to all claims, and M & D appeals that decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1999 Blickenstaff, M & D, Thomas, and Clegg formed Calderwood, a limited liability company engaged in the land development

business. The purpose of forming Calderwood was to commercially develop a parcel of real property on Overland Road in Boise. Calderwood was created pursuant to the Idaho Limited Liability Company Act (Idaho Code § 53–601, et seq) and in the beginning Calderwood was owned by Thomas (10% interest), individually and as trustee for the Thomas Trust, Clegg (45% interest), and Blickenstaff, individually (18% interest), and as trustee for M & D (27% interest).

Clegg is a Boise developer who holds a real estate broker's license and had been involved in other business enterprises with Blickenstaff prior to Calderwood. All the parties agree that Clegg dealt separately with Blickenstaff and Thomas, and the investors never met together to discuss Calderwood.

At Clegg's request, attorney Joyce drafted the Operating Agreement for Calderwood and acted as Calderwood's attorney. Joyce had previously worked as Clegg's attorney in other business ventures. In the Operating Agreement each party acknowledged that they were advised to seek independent counsel. The Operating Agreement provided that Clegg was appointed the managing member with the sole authority to bind Calderwood in business affairs. Blickenstaff was appointed the treasurer. The Operating Agreement also set forth the liability of each member, addressed potential conflicts of interest and provided for indemnification of members for certain acts by other members, among other terms and provisions.

Initially, Joyce sent the bills for his services rendered for Calderwood to Clegg. Clegg later asked Joyce to send his bills to Blickenstaff, as he was the treasurer. Through 1999, Calderwood paid Joyce's bills and Blickenstaff signed those checks on behalf of Calderwood. Joyce represented Calderwood in 2000 in connection with the sale of a Sonic Drive–In located on a portion of the Calderwood property and also represented Calderwood in connection with a development agreement negotiated with the city of Boise. Joyce submitted his bill to Clegg for these projects, and these bills were not paid.

According to deposition testimony, Blickenstaff asserted that he wanted to act as Calderwood's treasurer because he did not have complete confidence that Clegg would properly handle Calderwood's business and he wanted control of the checkbook. One particular point of concern was a developer's fee to be paid to Clegg, which Clegg and Blickenstaff discussed on several occasions. Clegg claimed he should receive a fee of $800,000, while Blickenstaff was adamant that he thought Clegg would eventually be entitled to a development fee, but only when the project was developed and sufficient funds were available. Thomas did not play any role in management.

Early on in the project, Calderwood took out a $1.2 million loan from U.S. Bank for purposes of refinancing the original property acquisition loan, and gave U.S. Bank a first position deed of trust on the Calderwood property as security. All the members of Calderwood were aware of the loan and deed of trust, and Blickenstaff personally guaranteed this loan, but M & D Trust did not.

In late 1999, Blickenstaff asserts he became more concerned with Clegg's management decisions, and Clegg claims he became frustrated with Blickenstaff's oversight. Clegg began negotiating to buy out Blickenstaff's and M & D's interests. Again, Thomas was not directly involved in the negotiations between Blickenstaff and Clegg.

Joyce was not a party to the negotiations, but in February 2000, Clegg asked Joyce to structure buyout documents and assignment agreements to show that Calderwood would buy out Blickenstaff and M & D. According to the assignment agreements, Clegg agreed Calderwood would pay $500,000 to Blickenstaff for his individual 18% interest in Calderwood. Clegg further agreed Calderwood would deposit $750,000 in cash or in a bank letter of credit for M & D's 27% interest. Clegg, as manager of Calderwood, and Blickenstaff, individually and as trustee for M & D, executed two assignment agreements according to these terms. Joyce claims that he merely performed the ministerial acts of drafting the assignment agreements and that Blickenstaff never asked Joyce for his advice as an attorney or to act in M & D's best

interest. However, Blickenstaff contends that he viewed the transaction as a "familiar" one where Joyce would represent all the parties fairly, and that Joyce knew or should have known that Blickenstaff and M & D were not represented by independent counsel.

Blickenstaff believed Clegg would complete the transaction by having Thomas infuse Calderwood with more capital, and then Calderwood would use the capital to buy out Blickenstaff and M & D. It is clear from the assignment agreements that Calderwood was the purchaser of Blickenstaff's and M & D's interests. On March 8, 2000, the parties signed the buyout documents prepared by Joyce. Clegg signed in his capacity as manager of Calderwood and Blickenstaff signed in his capacity as an individual and trustee for M & D. Also on that day, Blickenstaff and Clegg executed the agreement assigning Blickenstaff's individual interest in Calderwood to Calderwood. Blickenstaff was fully paid for his interest on April 6, 2000.

However, during the closing, Clegg informed Blickenstaff that he lacked funds to buy out M & D at that time but would be getting them soon. According to Blickenstaff, Clegg asked for more time and Blickenstaff, as trustee for M & D, signed another agreement assigning M & D's interest to Calderwood upon M & D's receipt of $750,000 or a letter of credit in 60 days. Blickenstaff claims he demanded a deed of trust against the Calderwood property to secure the extended time for payment and assumed it would be subordinate only to the U.S. Bank loan. However, this agreement does not mention a deed of trust.

During this same time period, Clegg, as manager of Calderwood, negotiated with Thomas, individually and as trustee for the Thomas Trust, for a loan to buy out Blickenstaff and M & D's interests and to pay Clegg the developer's fee he wanted. Thomas arranged for a $1.8 million loan from Zions Bank and then loaned $1.7 million of the money to Calderwood secured by a deed of trust on the Calderwood property. The Thomas/Clegg Agreement, dated April 4, 2000, is between Thomas and Clegg in their individual capacities, although it purports to amend the Calderwood Operating Agreement.

Thomas' insisted on having the deed of trust recorded against the Calderwood property, and subordinated to the U.S. Bank loan only. Thomas did not have the Calderwood property appraised and trusted Clegg's representation that the value would be sufficient to cover his loan. Thomas claimed he understood that M & D would be paid off from the proceeds of the $1.7 million loan to Calderwood and the remaining proceeds would go to Clegg's developer's fee and to infrastructure. Joyce also prepared the Thomas/Clegg Agreement on behalf of Clegg and contends he simply drafted the documents memorializing the agreement. The Thomas/Clegg Agreement specifically states that the $1.7 million loan is secured by a deed of trust. Thomas provided the funds on April 11, 2000, and the deed of trust in favor of Thomas was recorded on April 13, 2000. Blickenstaff did not know of the terms of the Thomas/Clegg Agreement and never saw it.

The Thomas/Clegg Agreement also outlined the resulting ownership of Calderwood: upon completion of buying out M & D, Clegg would receive 20% and Thomas would receive 80% of distributions; when Thomas had received an amount equal to Clegg's developer's fee of $800,000, then Clegg and Thomas would share distributions 50/50. Thomas and Clegg also agreed that if any future loans were necessary, both parties would jointly sign any guarantees.

During late March 2000, Clegg told Blickenstaff the M & D buyout would again be delayed and asked for another extension. Clegg apparently expected "large, permanent, long-term financing to take U.S. Bank out, [Thomas'] 1.7 million interest out, and M & D out." Blickenstaff agreed on behalf of M & D to accept a 6–month promissory note in the amount of $750,000 and a deed of trust against the Calderwood property. On April 11, 2000, Thomas and Clegg each signed the 6–month promissory note and a new M & D Assignment Agreement in their capacities as members of Calderwood. The M & D Assignment Agreement superseded the March 8, 2000, agreement and was made effective as of April 4, 2000. Thomas, as a member, and

Clegg, as the managing member, both signed a deed of trust to secure payment of the note. Joyce prepared these documents as well.

Blickenstaff testified he wanted both Clegg and Thomas to sign the M & D Assignment Agreement so they would personally guarantee the 6–month promissory note and he specifically asked Joyce to obtain Thomas' signature. However, Blickenstaff admits he never specifically used the words "personal guarantee" in his conversations with Joyce. Joyce obtained Thomas' signature, but only as a member of the Calderwood LLC. On April 13, 2000, Joyce first recorded the deed of trust in favor of Thomas and then recorded the deed of trust in favor of M & D. Joyce claimed he waited to record Thomas' deed of trust until after the loan proceeds were received on April 11, 2000, even though it was executed on March 8, 2000. Joyce also claims Blickenstaff never requested that M & D's deed of trust take priority over Thomas'.

Blickenstaff claims Clegg and Joyce led him to believe M & D's deed of trust would be subordinate only to the U.S. Bank loan, and that Thomas was making an investment in Calderwood, not a loan. Further, Blickenstaff claims he was not told that Clegg would receive a developer's fee from Thomas' loan and Thomas confirms this. Blickenstaff also testified that he believed the U.S. Bank loan was substantially less than the value of the Calderwood property and he did not consult with another attorney or order a title report or an appraisal. Blickenstaff did not consult with any of M & D's previous attorneys used in other transactions for advice in M & D's dealings with Calderwood. Finally, Blickenstaff did not know of Thomas' deed of trust when M & D received its deed of trust, nor did he know that Thomas' deed of trust also secured any future moneys loaned to Calderwood in addition to the $1.7 million.

Calderwood then obtained a second loan from U.S. Bank and Thomas executed and delivered a Subordination Agreement dated September 22, 2000, which was recorded September 26, 2000. This agreement subordinates Thomas' security interest in the Calderwood property to the second loan from U.S. Bank, entered into after the transactions with Blickenstaff and M & D.

Joyce billed Calderwood for the work done on drafting the Thomas/Clegg Agreement and drafting both the Blickenstaff and M & D buyout transactions. Joyce withdrew from representing Calderwood in August, 2001, for non-payment of fees.

Calderwood defaulted on the 6–month promissory note to M & D. Blickenstaff began foreclosure proceedings, ordered a title report, and at that point discovered M & D's deed of trust was subordinate to Thomas' deed of trust, in addition to the first U.S. Bank loan. He also discovered the value of the Calderwood property was likely not sufficient to pay the obligation owed to M & D after the loans to U.S. Bank and Thomas were paid.

On August 21, 2001, Blickenstaff as trustee for M & D filed a complaint against Thomas, individually and as trustee for the Thomas Trust, Clegg, and Joyce. M & D's claims against Clegg are not part of this appeal, as Clegg's summary judgment motion was denied. M & D alleged seven claims against Thomas: 1) breach of contractual obligation to a third party beneficiary; 2) common law fraud; 3) breach of fiduciary duty and inducing breach of fiduciary duty; 4) fraudulent transfer; 5) equitable subordination; 6) quasi estoppel; and 7) subordination. M & D also filed fraud, breach of fiduciary duty and negligence claims against Joyce. On November 1, 2002, Thomas filed his motion for summary judgment on all eight of the claims. On December 5, 2002, M & D filed its cross-motion for summary judgment on claims 1, 5, and 7. Joyce also filed a summary judgment motion on all claims against him.

On March 31, 2003, the district court issued a proposed decision on Thomas' summary judgment motion, and on April 17, 2003, the district court issued a proposed decision on Joyce's summary judgment motion. After considering comments to the proposed decisions, the district court granted Thomas' summary judgment motion on all of M & D's claims on May 28, 2003. The district court then granted Joyce's summary judgment motion on all of M & D's claims June 3, 2003. On July 2, 2003, the Thomas

and Joyce summary judgments were certified as final under I.R.C.P. 54(b) and M & D appealed.

## II. Standard of Review

■■■ This Court's review of a district court's ruling on a motion for summary judgment is the same as that required of the trial court when ruling on the motion. *City of Sandpoint v. Sandpoint Independent Highway District*, 139 Idaho 65, 67, 72 P.3d 905, 907 (2003); *Sun Valley v. Rosholt, Robertson & Tucker*, 133 Idaho 1, 3, 981 P.2d 236, 238 (1999). An appellate court exercises free review in determining whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Edwards v. Conchemco, Inc.*, 111 Idaho 851, 852, 727 P.2d 1279, 1280 (Ct. App.1986). The law is well established in Idaho that on a motion for summary judgment the trial court must determine whether the pleadings, depositions, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. I.R.C.P. 56(c); *Bonz v. Sudweeks*, 119 Idaho 539, 541, 808 P.2d 876, 878 (1991).

■■■ The burden of proving the absence of an issue of material fact rests at all times upon the moving party. *McCoy v. Lyons*, 120 Idaho 765, 769, 820 P.2d 360, 364 (1991); *G & M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 517, 808 P.2d 851, 854 (1991). To meet this burden the moving party must challenge in its motion and establish through evidence that no issue of material fact exists for an element of the nonmoving party's case. *Smith v. Meridian Joint School District No. 2*, 128 Idaho 714, 719, 918 P.2d 583, 588 (1996). If the moving party challenges an element of the nonmoving party's case on the basis that no genuine issue of material fact exists, the burden then shifts to the nonmoving party to present evidence that is sufficient to established a genuine issue of material fact. *Id.* at 719, 918 P.2d at 588. The non-moving party must submit more than just conclusory assertions that an issue of material fact exists to establish a genuine issue. *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 401, 987 P.2d 300, 313 (1999). A mere scintilla of evidence or only slight doubt is not sufficient to create a genuine issue of material fact. *Samuel v. Hepworth, Nungester & Lezamiz, Inc.*, 134 Idaho 84, 87, 996 P.2d 303, 306 (2000). In a motion for summary judgment, this Court will liberally construe the facts in favor of the nonmoving party. *S. Griffin Const., Inc. v. City of Lewiston*, 135 Idaho 181, 185, 16 P.3d 278, 282 (2000).

## III. Analysis

### A. Issues as to Joyce

M & D appeals the district court's grant of summary judgment to Joyce on M & D's claims of fraud and breach of fiduciary duty. Particularly, M & D contends that Joyce had a fiduciary duty to M & D because Joyce acted as M & D's attorney in preparing the buyout documents and the deed of trust and in recording the deed of trust. M & D also contends it placed trust and confidence in Joyce because of Blickenstaff's prior dealings with Joyce in another development project, and that Joyce assumed a duty to act in M & D's best interests when he was requested to take a certain action by Blickenstaff on M & D's behalf and agreed to do so.

■■■ The district court ruled that no attorney-client relationship existed. Furthermore, it found M & D failed to establish that Joyce and M & D had any special fiduciary relationship and there was no evidence that Joyce had failed to carry out any directives Blickenstaff had given him regarding Thomas' personal guarantee.

In his deposition, Blickenstaff stated that he believed Joyce was acting as his attorney in drafting documents for him in relation to the buyout of M & D by Calderwood. Blickenstaff testified that he asked Joyce to draft certain legal documents for him, that Joyce did draft the documents for him, and that even though Blickenstaff did not specifically ask him to be his attorney or pay him a retainer, that he asked Joyce to do legal work for him and Joyce did it. Though Blickenstaff admitted he knew that Joyce was the attorney for Calderwood, he contends the documents Joyce drafted for Blick-

**578**

enstaff were not for Calderwood but were specifically for M & D Trust. Though the testimony offered by Blickenstaff does not overwhelmingly point to an attorney-client relationship, it creates at least an issue of material fact regarding whether or not Blickenstaff reasonably believed that Joyce was acting in some respects on M & D's behalf.

Additionally, there is evidence that Blickenstaff asked Joyce to make sure Thomas' name appeared on the note and deed of trust on the Calderwood property securing the buyout of M & D's interest. Though Blickenstaff admitted he did not specifically use the words "personal guarantee," he did indicate to Joyce that he wanted Thomas' name on the documents and Joyce, as a knowledgeable attorney, clearly should have known there would be no purpose in having Thomas sign the documents merely as a member of Calderwood LLC. Under the Operating Agreement drafted by Joyce, Clegg had full authority to bind Calderwood to the obligation and having Thomas' name merely as a member accomplished nothing of legal significance. Clearly Joyce was aware or should have been aware that Blickenstaff was asking him as a lawyer to take action to further secure M & D's interest to assure the M & D note would be paid by Calderwood, and if not, by Thomas personally. Joyce then allegedly said "okay" and indeed obtained Thomas' signature on the documents, but only as a member of Calderwood.

We have held:

> The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him.... As a general rule, mere respect for another's judgment or trust in this character is usually not sufficient to establish such a relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting

not in his own behalf, but in the interests of the other party.

*Idaho First Nat. Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 278, 824 P.2d 841, 853 (1991). The district court found there was insufficient evidence to show that Blickenstaff reposed any special trust or confidence in Joyce as an attorney acting on his behalf. We find this conclusion to be in error. Though Blickenstaff may not have specified why he wanted Thomas' signature on the documents, Joyce breached a fiduciary responsibility towards Blickenstaff, not only to tell Blickenstaff that he was not representing him but also in failing to advise him that he was representing Clegg and that Clegg's and Thomas' interests were very much opposed to those of Blickenstaff and that Blickenstaff should secure independent legal advice to protect his interests against those of Thomas and Clegg. There was a material issue raised as to whether Blickenstaff believed Joyce was his attorney and was acting on his behalf, and even if it can be found that Joyce was not representing Blickenstaff, Joyce knew or should have known that Blickenstaff was relying on him to represent Blickenstaff's best interests, and Joyce acted contrary to this when he failed to secure Thomas' name as a guarantor and when he failed to notify Blickenstaff that he did not represent him and was in fact acting contrary to his best interests.[1]

▮ The district court also ruled against Blickenstaff on his claims of negligence and fraud, concluding again that there was no duty or special relationship between Joyce and M & D. For the reasons indicated above, we believe there are at least genuine issues of material fact as to the relationship between Blickenstaff, as trustee for M & D, and Joyce and as to any duties owed by Joyce to Blickenstaff. Thus the decision granting summary judgment to Joyce is vacated and remanded.

---

1. Apart from any fiduciary responsibility to Blickenstaff, Joyce likely also had an ethical duty to clarify his relationship vis-à-vis Calderwood and Clegg, to advise Blickenstaff to seek independent counsel and to advise Blickenstaff that his interests were opposed to those of Thomas and Clegg and that Joyce was not there to protect Blickenstaff's interests. *See, Idaho Rules of Professional Conduct* 1.7, 1.13 and 4.3 (2004).

## B. Issues as to Thomas

M & D appeals the district court's award of summary judgment to Thomas on the issues of breach of contractual obligation to a third party beneficiary, breach of fiduciary duty, common law fraud and fraudulent transfer, arguing there are disputed issues of material fact. M & D also appeals the district court's decision regarding equitable subordination, quasi estoppel, and subordination of liens, arguing that the district court's analysis of the effect of Thomas' agreement to subordinate his interests to U.S. Bank was in error.

### 1. Breach of Contractual Obligation to a Third Party Beneficiary

■ M & D argues on appeal that M & D was a third party beneficiary of the Thomas/Clegg Agreement and specifically agreed to obtain financing to timely pay off M & D's interest in Calderwood. The portion of the Thomas/Clegg Agreement which Blickenstaff alleges designates M & D as a third party beneficiary states:

> *FUTURE OBLIGATIONS:* Clegg and Thomas shall jointly sign such personal guarantees as deemed necessary by lenders for all future loans to Calderwood including the funds to pay off M & D Trust for the purchase of it's twenty seven (27%) percent interest for Seven Hundred Fifty Thousand ($750,000.00) Dollars.

The district court found that M & D did not establish that the Thomas/Clegg Agreement was made for M & D's benefit and that the agreement did not impose on Thomas or Clegg any duty to cause Calderwood to seek funds necessary for Calderwood to pay M & D in a timely manner. We agree with the district court.

■ We have held that "a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." *Lewis v. CEDU Educational Services, Inc.,* 135 Idaho 139, 142, 15 P.3d 1147, 1150 (2000). However, "before recovery can be had by a third party beneficiary, it must be shown that the contract was made for his direct benefit . . . and that it is not sufficient that he be a mere incidental beneficiary." *Dawson v. Eldredge,* 84 Idaho 331, 337, 372 P.2d 414, 418 (1962).

The language in the Thomas/Clegg Agreement simply states that Thomas and Clegg were obligated to sign whatever documents may have been required by a lender in order to obtain financing to buy out M & D's interest in Calderwood. The language is clear that all Thomas and Clegg were stating in the agreement was that they would do what a lender may require, but it does not specifically guarantee they would obtain financing to pay off M & D. Accordingly, under the clear terms of the agreement M & D was not an intended beneficiary of any promise on the part of Thomas and Clegg.

M & D argues the Thomas/Clegg Agreement is ambiguous and that our precedent in such cases allows the court to consider the surrounding circumstances in addition to the document itself. We do not find the agreement to be ambiguous and accordingly decline to consider M & D's related arguments.

### 2. Subordination Agreement

■ The next issue we consider is the effect of Thomas' Subordination Agreement with U.S. Bank that subordinated Thomas' deed of trust to the second loan obtained by Calderwood from U.S. Bank. On appeal, M & D argues that because Thomas, whose deed of trust was recorded ahead of M & D's, subordinated his deed of trust to the second U.S. Bank loan which was behind M & D in order of payment, M & D is now entitled to payment before both Thomas and U.S. Bank. This is referred to as a complete subordination. The district court disagreed, finding that this was a case of partial subordination where Thomas and U.S. Bank essentially exchanged positions of priority to the extent that U.S. Bank's loan is smaller or equal to Thomas's interest. Or, in other words, if Thomas' claim was for $100 and the second U.S. Bank loan was for $75, the first $100 to be paid from Calderwood would go $75 to U.S. Bank, and $25 to Thomas. M & D would then be paid in full, and any remaining payment would go towards Thomas' remaining $75 interest. The district court found that because M & D was not a party to Thomas' Subordination Agreement and be-

cause M & D's interest was neither harmed or helped by the Subordination Agreement in terms of its priority in line, M & D is not entitled to benefit by Thomas' agreement to subordinate his interest to U.S. Bank.

The relevant portion of the Subordination Agreement reads as follows:

> SUBORDINATION. The Subordinated Deed of Trust and the Subordinated Indebtedness [the $1.7 million note and deed of trust owed by Calderwood to Thomas] secured thereby is hereby subordinated in all respects to Lender's Lien [the security interest of U.S. Bank securing the further extension of credit] and the Superior Indebtedness [U.S. Bank's extension of credit], and it is hereby agreed that the Lender's Lien shall be and remain, at all times, prior and superior to the lien of the Subordinated Deed of Trust. Beneficiary [Thomas] also subordinates to Lender's Lien all other Security Interests in the Real Property held by Beneficiary [Thomas], whether now existing or hereafter acquired. The words "Security Interest" mean and include without limitation any type of collateral security, whether in the form of a lien, charge, mortgage, deed of trust, assignment, pledge, chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

Though Thomas provides authority from California and Arizona supporting the district court's utilization of a partial subordination theory, that rule has never been adopted in Idaho. The district court correctly noted that the theory of partial subordination does not affect M & D's interest in the Calderwood property in any way and essentially leaves M & D's priority of payment the same as it was before the Subordination Agreement between Thomas and U.S. Bank was entered into. However, there are basic rules of priority and recording which are violated by such an application of the law. We find the Alabama Supreme Court case cited by M & D instructive on this issue. In it that court defined a subordination agreement as:

> An agreement by which one holding an otherwise senior lien or other real estate interest *consents to a reduction in priority* vis-a-vis another person holding an interest in the same real estate. An agreement by which *the subordinating party agrees that its interest in real property should have a lower priority than the interest to which it is being subordinated.* *Black's Law Dictionary* (6th ed.1990). By definition, "subordination" contemplates a reduction in priority. Nothing in the definition contemplates *raising* a lower priority lienholder up to the position of the subordinating party.

*AmSouth Bank. N.A. v. J & D Financial Corp.*, 679 So.2d 695, 698 (Ala.1996). As the Georgia Supreme Court noted in *Old Stone Mortg. Realty Trust v. New Georgia Plumbing, Inc.*, 239 Ga. 345, 236 S.E.2d 592 (1977), "it is the rule in other jurisdictions that 'one who subordinates a first lien to a third lien makes his lien inferior to both the second and the third liens.' 51 AmJur2d, Liens, s 55." 236 S.E.2d at 593.

■ Though Thomas has every right to release his claim on his position of priority over M & D and place himself behind the second U.S. Bank loan, he does not have the right or ability to elevate U.S. Bank's priority to a position ahead of M & D. Because M & D's deed of trust was recorded before the second U.S. Bank lien, M & D has the right to be paid by Calderwood before U.S. Bank receives any payment on its second loan. Certainly U.S. Bank could not obtain a priority ahead of Thomas without Thomas' permission; and likewise, it cannot obtain a priority ahead of M & D without M & D's permission. Because Thomas relinquished his right to receive payment until after U.S. Bank received payment in full on its second loan to Calderwood, M & D is entitled to be paid in full before U.S. Bank is paid on its second loan and consequently before Thomas receives payment as well. In *Culp v. Tri-County Tractor, Inc.*, 112 Idaho 894, 897, 736 P.2d 1348, 1351 (Ct.App.1987) the Court of Appeals held:

We begin by noting the general thrust of a subordination agreement: "It is the subordination of the right to receive payment of certain indebtedness (the 'subordinated debt') to the prior payment of certain other indebtedness (the 'senior debt') of the same debtor".... [A] "complete" subordination permits no payment to be made on the subordinated debt at any time while the senior debt remains outstanding.

We agree that when one debt is senior to another debt in priority of payment, the inferior debt may not be paid ahead of any senior debt without the agreement of the senior creditor, regardless of any subordination agreement between another senior creditor and the inferior creditor.

We therefore vacate the findings of the district court declining to place M & D's interest above Thomas' by virtue of the subordination agreement entered into between Thomas and U.S. Bank.

### 3. Other Issues

Because of our resolution of the subordination issue, it is not necessary to address the remaining rulings of the district court on summary judgment relating to the fiduciary duties alleged between members of a limited liability company.

### IV. Conclusion

We vacate the decision of the district court granting summary judgment to Joyce on all counts. We vacate the district court's decision as to Thomas based upon the Subordination Agreement which places his secured interest behind that of M & D and the second U.S. Bank loan. We remand this case for proceedings consistent with this opinion. We award costs on appeal to Blickenstaff.

Justices KIDWELL and BURDICK and Judges Pro Tem JUDD and WALTERS concur.