**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 37951-2010**

| | | |
|---|---|---|
| KARLETTA GRACE BERRY, personally and as Personal Representative of the Estate of Jerry Lee Roy Berry, and CAPTAIN'S WHEEL RESORT, INC., an Idaho Corporation, | ) ) ) ) ) | Coeur d'Alene, May 2012 Term

2012 Opinion No. 79 |
| Plaintiffs-Appellants, | ) ) | Filed: May 29, 2012 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| MICHAEL B. McFARLAND; MICHAEL B. McFARLAND, P.A.; and KAREN ZIMMERMAN, | ) ) ) ) | |
| Defendants-Respondents. | ) ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, in and for Kootenai County. The Hon. Charles W. Hosack, District Judge.

The order of the district court is affirmed.

Rex A. Finney, Sandpoint, argued for appellant.

Michael B. McFarland, Coeur d'Alene, argued for respondents.

---

EISMANN, Justice.

In this case, a jury returned a special verdict that: (a) awarded damages against an attorney and his girlfriend based upon the jury's finding that they had breached their fiduciary duties to a former client of the attorney by purchasing half of his stock in a closely held corporation for less than its fair market value, and (b) cancelled debts owing by the corporation to the attorney and his girlfriend based upon the jury's finding that they had breached their fiduciary duties to a shareholder, the former client's widow, by making loans to the corporation. The district court granted a new trial on the ground that there was insufficient evidence to justify the verdict, and this appeal followed. We affirm the grant of a new trial.

# I.

## Factual Background.

The Captain's Wheel Resort, Inc., located on the shore of Lake Pend Oreille, was incorporated in 1996 with 400 shares of stock. The corporation's assets consisted of real property, a business that included a restaurant and bar, and personal property associated with such business. Originally, 200 shares of stock were issued to Norman and Susan Nordstrom, husband and wife, and 200 shares were issued to James and Jean Campbell, husband and wife.

In June 2000, Jerry Berry purchased the Nordstroms' shares of stock for $50,000. At that time, Mr. Berry and Karletta Berry had been married for about three years. Later, Mr. Berry had judgments entered against him in the state of Washington due to a failed business venture there. Michael McFarland, an attorney who practices bankruptcy law, and his girlfriend, Karen Zimmerman, frequented the resort, and Mr. Berry became acquainted with them. In late 2000 or early 2001, Mr. Berry went to Mr. McFarland's law office to consult with him about filing bankruptcy and whether he could retain his stock if he filed bankruptcy. Mr. McFarland informed him that the stock was not exempt property and would not be protected in a bankruptcy proceeding. Mr. Berry decided not to pursue bankruptcy and left without asking Mr. McFarland to perform any other legal services for him.

In 2003, Mr. Berry had the opportunity to purchase the Campbells' stock for $100,000, and Mr. McFarland agreed to lend him the money to do so. On July 25, 2003, Mr. Berry picked up $40,000 from Mr. McFarland at his law office. The receipt signed by Mr. Berry stated that the money was for "advance (partial) on loan to be secured by stock." A portion of the $40,000 was provided by Ms. Zimmerman. On August 4, 2003, Mr. Berry received the remaining $60,000 from Mr. McFarland. That money was obtained by Ms. Zimmerman, who borrowed money pursuant to an interest-only loan secured by her mother's house. When they made the loan, Mr. McFarland and Ms. Zimmerman thought that the resort would sell in a few years and they would be repaid. That did not happen.

In 2006, Mr. Berry was diagnosed with pancreatic cancer, and he was hospitalized from June 17 to 21, 2006, due to adverse effects of the chemotherapy. On June 21, 2006, Mr. McFarland delivered two proposed stock purchase agreements to Mrs. Berry. Under one proposed agreement, Mr. Berry would sell the 200 shares of stock he had purchased from the

Campbells to Mr. McFarland and Ms. Zimmerman for the $100,000 they had loaned him. Under the other proposed agreement, Mr. Berry would sell all 400 shares of stock to Mr. McFarland and Ms. Zimmerman for the $100,000, and they would hold 200 shares in trust for Mrs. Berry, and upon her death for her son. Both agreements were back dated to August 9, 2003. Mr. McFarland told Mrs. Berry that Mr. Berry had to sign one of the two proposed agreements.

On July 4, 2006, Mr. Berry went to Mr. McFarland's residence with a third proposed agreement. It provided: that the 200 shares acquired from the Campbells would be collateral for the $100,000 loan; that upon the sale of the corporation, the loan would be repaid with interest at 10% per annum; that until the loan was repaid, Mr. McFarland and Ms. Zimmerman could use the services provided at the resort, such as dining, refreshments, and moorage, at no expense to them; and that at his discretion Mr. Berry could repay the loan, plus interest, by transferring the 200 shares of stock to Mr. McFarland and Ms. Zimmerman. After considering and discussing all three proposed agreements, Mr. Berry, Mr. McFarland, and Ms. Zimmerman executed the Stock Purchase Agreement by which Mr. Berry sold the 200 shares of stock to Mr. McFarland and Ms. Zimmerman for the $100,000.

On October 15, 2006, a special meeting was held of the three shareholders in the corporation: Mr. Berry, Mr. McFarland, and Ms. Zimmerman. They elected themselves and Mrs. Berry as directors. The directors then met and, among other things, resolved that the shareholders would be Mr. and Mrs. Berry jointly owning 200 shares and Mr. McFarland and Ms. Zimmerman jointly owning 200 shares. Prior to then, Mrs. Berry had not been a shareholder in the corporation.

Mr. Berry died on November 4, 2006. After Mr. Berry's death, Mr. McFarland took control of the corporation. He had the locks to the resort changed and did not give Mrs. Berry a key. On November 12, 2006, the day after the memorial celebration for Mr. Berry at the resort, Mr. McFarland went to Mrs. Berry's home and presented her with a proposed special resolution in lieu of a director's meeting. When she would not agree to it, he later gave her untimely notice of a special meeting of the board of directors. That meeting had to be rescheduled when she objected that the notice was not timely.

The special meeting of the directors was held on November 29, 2006, with the three remaining directors present. Prior to his death, Jerry Berry held the offices of president and treasurer in the corporation. At the meeting, Mr. McFarland was nominated for president, Ms.

Zimmerman was nominated for treasurer, and Mrs. Berry was nominated for both president and treasurer. Mr. McFarland and Ms. Zimmerman were elected by majority vote (2-1). The directors then approved the following resolutions: (a) granting the treasurer full access to all corporate bank accounts (2-1); (b) acknowledging that Mr. McFarland had made loans to the corporation totaling $8,000 (3-0); and (c) listing the corporation for sale with the real estate agency where Ms. Zimmerman was employed (2-1).

Pursuant to Mr. Berry's instructions, Mrs. Berry had been receiving $200 per week from the resort. In December 2006, Mr. McFarland terminated those payments. He also informed the management that she could no longer sign for meals for her guests. After receiving notice of a special directors' meeting to remove her as a director for cause, Mrs. Berry filed this action on February 14, 2007. The special meeting was held on the following day, and Mrs. Berry was removed for cause as a director by a majority vote (2-1). The alleged cause was that Mrs. Berry had taken and refused to return corporate records and that she had the bank sending the corporation's bank statements to her house.

On February 16, 2007, Mr. McFarland and Ms. Zimmerman held a special meeting of the directors and resolved to sell one share of stock to each of two Captain's Wheel employees for the sum of $100 per share. The following day, the employees each purchased one share of stock. The resort closed for business on January 4, 2010.

The complaint alleged various causes of action against Mr. McFarland and Ms. Zimmerman, but the case was submitted to the jury on three theories: (1) that Mr. McFarland breached his fiduciary duty as Mr. Berry's attorney with respect to the Stock Purchase Agreement; (2) that Mr. McFarland and Ms. Zimmerman breached their fiduciary duties (not based upon any attorney-client relationship) with respect to the Stock Purchase Agreement; and (3) that Mr. McFarland and Ms. Zimmerman breached their fiduciary duties to Mrs. Berry as a shareholder by making loans to the corporation. The jury found against Mr. McFarland and Ms. Zimmerman on all three theories. It awarded damages against them in the sum of $380,500 for breaching their fiduciary duties with respect to the stock transaction, and it held that the corporation did not have to repay them $176,300.18 in loans for breaching their fiduciary duties as directors. They filed a motion for a new trial on several grounds, including insufficiency of the evidence to support the verdict, and the district court granted them a new trial on that ground. Mrs. Berry and the corporation then appealed.

## II.

### Standard of Review

In *Hudelson v. Delta International Machinery Corp*., 142 Idaho 244, 248, 127 P.3d 147, 151 (2005) (citations omitted), we stated the standard of review of an order granting a new trial as follows:

> When reviewing a trial judge's grant of a new trial on appeal, this Court applies the abuse of discretion standard. A trial judge has wide discretion to grant or deny a request for a new trial, and we will not overturn the judge's decision absent a showing of a manifest abuse of discretion. Although we will review the evidence, we primarily focus upon the process used by the trial judge in reaching his or her decision, not upon the result of that decision. The trial judge is in a far better position than we to weigh the demeanor, credibility and testimony of witnesses and the persuasiveness of all the evidence. Therefore, we do not weigh the evidence. Our inquiry is: (1) whether the trial judge correctly perceived the issue as one of discretion; (2) whether the trial judge acted within the outer boundaries of his or her discretion and consistently with the legal standards applicable to the specific available choices; and (3) whether the trial judge reached his or her decision by an exercise of reason.

## III.

### Did the District Court Err in Holding that There Was Not Substantial Evidence Supporting the Verdict that Mr. McFarland Breached His Fiduciary Duty as Attorney for Mr. Berry?

In late 2000 or early 2001, Mr. Berry sought legal advice from Mr. McFarland about whether he could protect his stock in the Captain's Wheel Resort from creditors by filing bankruptcy, and Mr. McFarland told him that the stock was not exempt property and could not be protected from creditors in bankruptcy. Mr. Berry then left without asking Mr. McFarland to perform any legal services for him. In 2003, Mr. McFarland and Ms. Zimmerman loaned Mr. Berry $100,000 so that he could purchase the Campbells' stock, and in 2006 they purchased that stock from Mr. Berry for the same price. The Plaintiffs contended that Mr. McFarland breached the fiduciary duty arising from his attorney-client relationship with Mr. Berry by purchasing the stock for $100,000, and that Ms. Zimmerman conspired with Mr. McFarland to do so.

The district court instructed the jury that it could consider whether Mr. McFarland breached his fiduciary duty as Mr. Berry's attorney when he purchased the stock. The jury

5

answered "Yes" to the question on the special verdict, "Was there any breach of duty regarding the Sttock [sic] Purchase Agreement by defendant Michael McFarland as the attorney for the plaintiff which was the proximate cause of damages to plaintiff?" In granting a new trial, the district court held that there was insufficient evidence to support that verdict.

"Whether an attorney-client relationship exists is a question of fact." *Warner v. Stewart*, 129 Idaho 588, 593, 930 P.2d 1030, 1035 (1997). In *Warner*, we noted two lines of authority from other jurisdictions as to the appropriate test for determining whether an attorney-client relationship exists. "Some courts have held that the controlling factor is the client's subjective belief which is reasonable under the circumstances. Other courts have construed the attorney-client relationship in more strict contractual terms, finding that no attorney-client relationship exists absent clear assent by both the putative client and attorney." *Id*. (citations omitted). In *Warner* we did not resolve the issue, finding that there was no attorney-client relationship under either test.

In this case, we must resolve that issue to give guidance if there is a retrial on remand. The jury instructions regarding the alleged breach of the attorney-client relationship were clearly inadequate, in that they did not define what constituted an attorney-client relationship, the scope of the attorney-client relationship, or the duration of the attorney-client relationship. The jurors certainly may have felt that after Mr. Berry's death, Mr. McFarland's conduct towards Mrs. Berry was very heavy handed, and the Plaintiffs recount that evidence at length on appeal. However, there still must be evidence supporting the causes of action presented to the jury.

As a general rule, no attorney-client relationship exists absent assent by both the putative client and attorney. "An attorney-client relationship can be established when the attorney is sought for assistance in matters pertinent to his [or her] profession." *Stuart v. State*, 118 Idaho 932, 934, 801 P.2d 1283, 1285 (1990). If the attorney agrees to provide assistance, or engages in conduct that could reasonably be construed as so agreeing, then there is an attorney-client relationship. The scope of the representation depends upon what the attorney has agreed to do. If the client consults with the attorney, the relationship terminates upon the completion of the consultation unless the attorney agrees to continue the relationship or to undertake a specific matter for the client. If the attorney agrees to undertake a specific matter, the relationship terminates when that matter has been resolved. If the attorney agrees to handle any matters the client may have, the relationship continues until the attorney or client terminates the relationship.

6

There are also circumstances in which the existence of an attorney-client relationship can exist based upon the attorney's failure to clarify whom the attorney is representing where, under the circumstances, one of the parties could reasonably believe that the attorney is representing that person's interests. Thus, the attorney-client relationship also exists if the attorney has represented the client in a variety of matters over a period of time and the attorney is asked to perform services in connection with a matter in which the client is involved, unless the attorney clearly informs the client that the attorney is not representing the client with respect to that matter. Likewise, where an attorney has represented a closely held business entity and then provides legal services for a transaction involving that entity and its owners where their interests are adverse, the attorney must clearly inform all involved who is the attorney's client and inform the others to seek independent legal advice. *Blickenstaff v. Clegg*, 140 Idaho 572, 577-78, 97 P.3d 439, 444-45 (2004).

The Plaintiffs contend that there is evidence of a continuing attorney-client relationship because Mr. Berry kept Mr. McFarland's business card in his pocket until his death. They also point to hearsay testimony that Mr. Berry told a waitress at the Captain's Wheel that Mr. McFarland and Ms. Zimmerman were "his attorneys and they've done a good job for him" and that he told his daughter that Mr. McFarland was "his lawyer."

That evidence is insufficient to show a continuing attorney-client relationship from late 2000 or early 2001 until the stock purchase in 2006. Mr. Berry may have appreciated Mr. McFarland's counsel regarding bankruptcy, he may have liked Mr. McFarland personally and respected his legal abilities, and he may have felt that if he needed any further legal services he would seek the assistance of Mr. McFarland. However, the Plaintiffs do not point to any facts showing that Mr. Berry did consult with Mr. McFarland or ask him to perform further legal work during the five years prior to the stock purchase. We need not speculate as to what Mr. Berry intended by referring to Mr. McFarland as his lawyer because any subjective belief he had that there was a continuing attorney-client relationship did not create one under these circumstances. Likewise, there is no evidence that Mr. McFarland agreed to a continuing attorney-client relationship. The Plaintiffs do not contend that he was paid a retainer, nor do they point to any evidence that he had any continuing professional relationship with Mr. Berry. The Plaintiffs have not pointed to any facts that would support a finding of an attorney-client relationship at the time of the stock transaction.

7

Relying upon *Ainsworth v. Harding*, 22 Idaho 645, 128 P. 92 (1912), the Plaintiffs assert, "If an attorney enters into an attorney-client relationship with a client in regard to certain property, the attorney is not allowed to buy the opposing title to the property, without holding it in trust for the client." They argue that Mr. Berry consulted with Mr. McFarland regarding protecting the corporate stock from creditors, and so Mr. McFarland could not later purchase the stock from Mr. Berry without violating the fiduciary duties to him. The Plaintiffs misread *Ainsworth*.

In *Ainsworth*, a man in Idaho had died intestate, leaving three daughters in Iowa and two sons in Idaho. The daughters retained an attorney in Iowa to travel to Idaho to determine whether they were entitled to inherit any property. Prior to his death, the father had conveyed some real property to one of his sons. After a lengthy investigation by the attorney, both brothers agreed that the real property was part of their father's estate, and the son conveyed the real property to the attorney for the use and benefit of the sisters. At the time of the conveyance, there was still an attorney-client relationship between the attorney and the sisters. When the attorney sought to keep the property for himself, the sisters sued. This Court held that under those circumstances, the attorney took title to the property in trust for his clients. The facts in this case bear no relationship to those in *Ainsworth*. The district court did not err in holding that there was insufficient evidence to sustain the verdict that when Mr. McFarland purchased the stock he breached his fiduciary duty to Mr. Berry arising from an attorney-client relationship.

## IV.

## Did the District Court Err in Holding that There Was Not Substantial Evidence Supporting the Verdict that Mr. McFarland and Ms. Zimmerman Breached their Fiduciary Duties to Mr. Berry?

The district court also instructed the jury that a fiduciary duty exists "where there has been a special confidence imposed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of one reposing the confidence." The Plaintiffs contended that Mr. McFarland and Ms. Zimmerman developed such a close relationship with Mr. Berry that they had a fiduciary duty to him and that they breached that duty by purchasing the stock for less than its fair market value. The jury answered "Yes" to the question in the special verdict, "Was there any breach of fiduciary duty regarding the Stock

Purchase Agreement owed by defendants to plaintiffs, even though there was no attorney-client relationship between them, which was the proximate cause of damages to plaintiffs?" The Plaintiffs have not pointed to any evidence supporting that verdict.

Mr. McFarland and Ms. Zimmerman loaned Mr. Berry $100,000 in 2003 so that he could purchase the Campbells' 200 shares of stock. Mr. Berry was not asked to sign a promissory note or to give any security for the loan. After Mr. Berry was diagnosed with cancer, Mr. McFarland made two written proposals for Mr. Berry to pay the debt by transferring corporate stock to Mr. McFarland and Ms. Zimmerman. Under one proposal, they would receive the 200 shares of stock in payment of the loan. Under the other, they would receive the 200 shares in payment of the loan and they would hold Mr. Berry's other 200 shares in trust for Mrs. Berry and, upon her death, for her son. About two weeks later, they met with Mr. Berry, who had a third written proposal to have the 200 shares purchased from the Campbells be collateral for the $100,000 loan. After the parties discussed the matter, they agreed that Mr. Berry would pay the debt by transferring the 200 shares to Mr. McFarland and Ms. Zimmerman.

In *Gray v. Tri-Way Construction Services, Inc.*, 147 Idaho 378, 386, 210 P.3d 63, 71 (2009), we stated that examples of fiduciary relationships included family members, partners, attorney and client, personal representative and beneficiary of an estate, principal and agent, insurer and insured, and close friends. We did not have occasion to address what was necessary in order for a friendship to become a fiduciary relationship. As a general rule, a fiduciary relationship is not created merely because of respect for a friend's judgment or trust in the friend's character. *Blickenstaff v. Clegg*, 140 Idaho 572, 578, 97 P.3d 439, 445 (2004). We need not address when a close friendship can be held to have become a fiduciary relationship because even assuming the evidence showed such a fiduciary relationship, it does not show a breach of that relationship.

The nature of the fiduciary duties that arise from each of the relationships mentioned in *Gray* varies. Obviously, the fiduciary duties an attorney owes to a client differ from those that one close friend may owe to another. The jury instructions in this case did not give the jury any guidance as to the duties arising out of this alleged fiduciary relationship.

Mr. McFarland and Ms. Zimmerman would not violate any fiduciary duty by seeking to have their loan repaid. There had been no principal payments made on the loan for three years.

9

The existence of a fiduciary duty would not require that they forgive the loan or not seek to have it repaid.

They also would not breach any fiduciary duty by taking the corporate stock in payment of the loan, even if the value of the stock greatly exceeded the amount of the loan. Assuming that Mr. Berry placed trust and confidence in Mr. McFarland and Ms. Zimmerman, the Plaintiffs have not pointed to any evidence that he relied upon their opinions as to the value of the stock. Mr. Berry was the owner of the stock and the president of the corporation, and he was in charge of its daily operations. He had more information about the value of its stock than did Mr. McFarland or Ms. Zimmerman. There is no allegation that they withheld relevant information from Mr. Berry regarding the stock's value. In addition, Mr. Berry had almost two weeks to consider their proposals. The Plaintiffs have not pointed to any evidence indicating that Mr. Berry's decision to transfer the stock in payment of the debt was anything other than his decision made free of any influence from Mr. McFarland and Ms. Zimmerman, other than their desire that the loan be repaid. The district court did not err in holding that there was insufficient evidence to support this portion of the jury's verdict.

## V.

### Did the District Court Err in Holding that There Was Not Substantial Evidence Supporting the Verdict that Mr. McFarland and Ms. Zimmerman Breached their Fiduciary Duties as Directors by Loaning Money to the Corporation?

After they became directors, Mr. McFarland and Ms. Zimmerman made loans to the corporation of substantial sums. Mr. McFarland also loaned $8,000 to the corporation before becoming a director. The district court instructed the jury that they could determine whether Mr. McFarland and Ms. Zimmerman breached their fiduciary duties to Mrs. Berry as a shareholder by loaning money to the corporation. The jury found that they had and that they could not recover payment for loans to the corporation totaling $176,300.18.

The Plaintiffs have not pointed to any evidence supporting this portion of the verdict. They do not seek to explain how a director can breach any fiduciary duty simply by loaning money to the corporation. The district court did not err in holding that there was insufficient evidence to support this portion of the verdict.

The jury also found that Mr. McFarland and Ms. Zimmerman breached their fiduciary duties as directors by issuing the two shares of stock to the corporate employees. The jury was not specifically instructed regarding that issue, either as to the elements of any cause of action or the damages recoverable. This was the last question on the special verdict form, and the jury was not asked to award any damages based upon this answer. The district court granted a new trial on all issues, and the Plaintiffs have not challenged on appeal the granting of a new trial as to this issue. Therefore, we will not address it.

## VI.
### Conclusion.

We affirm the grant of a new trial. We award costs on appeal to respondents.


Chief Justice BURDICK, Justices J. JONES, W. JONES, and HORTON **CONCUR.**

J. JONES, Justice, specially concurring.

I concur in the Court's opinion. The evidence presented at trial was simply insufficient to support the verdict, although it does raise some concerns. The first relates to the circumstances leading to the preparation of the two proposed stock purchase agreements that Mr. McFarland delivered to Mrs. Berry on June 21, 2006. Where an attorney prepares two alternate purchase plans for a friend who is hospitalized with a terminal illness, rather than simply presenting one written offer documenting terms which the attorney contends the parties orally agreed upon three years previously, it gives the appearance of acting in an attorney-client capacity, which Mr. McFarland seemed to acknowledge during oral argument of this case before the Court. However, the evidence in the record pertaining to the events leading up to the signing of one of the agreements is spotty, at best. A second concern relates to an attorney entering into a transaction with a person who may or may not have been a client or who, regardless of an attorney-client relationship, may have established a relationship of trust with the attorney. Neither of the agreements prepared by Mr. McFarland contained language indicating the capacity in which he was acting, nor language indicating that since one party was an attorney the other party was advised to consult independent legal counsel. If the person with whom the attorney is dealing is, indeed, a current client, Rule 1.8 of the Idaho Rules of Professional Conduct apply, requiring: the terms of the transaction to be fair and reasonable to the client, full written disclosure of the terms

11

in understandable language, advice to seek and a reasonable opportunity to obtain independent legal advice, and the informed written consent of the client. Even in the absence of an attorney-client relationship, where the parties have established a relationship of trust and the parties are not dealing on equal terms, the stage may be set for overreaching. Again, the evidence in this regard was somewhat lacking. The third concern relates to the treatment of Mrs. Berry as a stockholder by the other directors/stockholders, Mr. McFarland and Ms. Zimmerman, following Mr. Berry's death. The Court is correct that the shabby treatment of Mrs. Berry and the attempted overreach by the adversary directors/stockholders may have contributed to the jury verdict. Although Mrs. Berry placed heavy emphasis on these actions during the trial and on appeal, she did not assert a cause of action against the other directors/shareholders for oppressive conduct. The long and short of it is that although Mrs. Berry's evidence at trial disclosed some smoke, it did not produce the actual fire necessary to support the verdict. A remand for a new trial is the appropriate course in this situation.