679 So.2d 695 (1996)
AMSOUTH BANK, N.A.
v.
J & D FINANCIAL CORPORATION.
1931140.
Supreme Court of Alabama.
June 28, 1996.
Rehearing Denied August 30, 1996.
*696 Eric J. Breithaupt of Feibelman, Shulman & Terry, Mobile, for Appellant.
Peter S. Mackey of Burns, Cunningham & Mackey, Mobile, for Appellee.
PER CURIAM.
AmSouth Bank appeals from a summary judgment in favor of J & D Financial Corporation holding that J & D Financial is entitled to $77,341.43 in accounts receivable from Lori & Me, a division of Sweet Bonnie Sue, Inc., and holding that J & D is entitled to $1,758.00, collected by AmSouth from creditors of Lori & Me. The following stipulation of facts was submitted to the trial judge, who, before entering the summary judgment, heard oral argument and considered memorandums of law submitted by both parties:
"1. On June 1, 1988, AmSouth Bank, N.A., made loans to Sweet Bonnie Sue, Inc. [(`SBS')], in the amount of $150,000. In connection with these loans, SBS granted a security interest to AmSouth in the following collateral:
"`All inventory and accounts of the Debtor, whether now existing or hereafter acquired or created, all goods represented thereby, and all such goods that may be reclaimed or repossessed from or returned ... by the debtor's customers, and all general intangibles of the debtor.'
"2. In order to perfect its security interest, AmSouth filed a UCC-1 with the Alabama Secretary of State on June 27, 1988. At the time of perfection, the lien of AmSouth was subordinate to an existing security interest held by Presidential Financial Corporation.
"3. SBS later defaulted in its obligation to AmSouth ... on June 1, 1991, and, on September 11, 1992, [AmSouth] obtained a judgment against SBS in the Circuit Court of Mobile County, Alabama (Case No. CV-92-1501), for $199,242. The judgment remains unpaid.
"4. On November 7, 1991, J & D Financial Corporation entered into a factoring agreement[1] with SBS, and [J & D] subsequently filed a UCC-1 with the Alabama Secretary of State on December 2, 1991. The UCC-1 of J & D reads as follows:
"`All present and hereafter created accounts receivable, accounts, contract rights, and general intangibles and the interest of debtor in any returned, repossessed, finished or unshipped goods.'[2]

*697 "5. Pursuant to the factoring agreement, J & D purchased invoices from SBS, and [J & D] extended advances of various sums of money on a monthly basis.
"6. By virtue of their respective security interests, both AmSouth and J & D claim rights in the accounts receivable of SBS.
"7. Between November 7, 1991, and April 7, 1992, J & D [pursuant to its factoring agreement with SBS,] collected accounts receivable of SBS totalling $77,341.43. None of these amounts were remitted to AmSouth, nor did AmSouth give permission to J & D for the collection of the funds. On April 16, 1992, AmSouth gave written notice to SBS wherein [AmSouth] terminated the right of SBS to collect its own accounts receivable.
"8. In addition to the security interests of AmSouth and J & D, another factoring entity known as Presidential Financial Corporation also held a security interest in the accounts receivable of SBS, which [security interest] was perfected by UCC-1 filed with the Alabama Secretary of State on December 18, 1987. As part of its factoring agreement with SBS, however, J & D obtained a subordination agreement from Presidential on November 25, 1991.
"9. The parties stipulate to the authenticity of the following documents attached hereto as exhibits: [security agreement of AmSouth; UCC-1 of AmSouth; certificate of judgment against SBS; factoring agreement of J & D; UCC-1 of J & D; UCC-1 of Presidential; subordination letter from Presidential].
"10. Presidential has collected no amount on its judgment against SBS and/or Lori & Me.[3]
"11. AmSouth has collected the amount of $1,758 from creditors of Lori & Me during the same time that J & D was factoring accounts receivable for Lori & Me."
It is undisputed that, without the subordination agreement between AmSouth and J & D, the lienholders would be ranked in priority as follows: (1) Presidential; (2) AmSouth; and (3) J & D. There is also no dispute that the central issue in this appeal is the effect of the subordination agreement between Presidential and J & D on AmSouth's priority status. The agreement between Presidential and J & D stated:
"This letter is to state that we are subordinating to you our interest in invoices of LORI & ME, which are and must look identical to the attached Exhibit A.
"LORI & ME, per our understanding, is a division of Sweet Bonnie Sue, Inc., but, as discussed, this subordination applies only to LORI & ME invoices which are identical to Exhibit A."
The trial court held that the subordination agreement resulted in a change in priority among lienholders, establishing the following order: (1) J & D; (2) AmSouth and (3) Presidential. In addressing the effect the subordination agreement between J & D and Presidential had on AmSouth, the trial court relied on I.T.T. Diversified Credit v. First City Capital Corp., 737 S.W.2d 803 (Tex. 1987). The fact situation in that case was virtually identical to the situation before us today. In fact, in ITT the trial court and the intermediate court reached the result AmSouth urges this Court to reach in this case, that is, the following rank in priority: (1) AmSouth; (2) J & D, and (3) Presidential. As AmSouth urges us to do here, the trial judge in ITT held that the second priority lienholder (here AmSouth) moved into first position and that the first priority lienholder (here Presidential), in subordinating its interests to the third priority lienholder (here J & D), merely moved behind the third priority lienholder with the other lienholders shifting upward by 1. The Texas Court of Appeals affirmed the trial court's decision, holding *698 that the first priority lienholder "could have transferred its interest to any inferior lienholder," ITT Diversified Credit Corp. v. First City Capital Corp., 717 S.W.2d 419, 421 (Tex. App.1986), but did not, for whatever reason, do so. The Texas Court of Appeals, in making its ruling, relied on this Court's case of Shaddix v. National Surety Co., 221 Ala. 268, 128 So. 220 (1930), as authority for its decision:
"In McConnell v. Mortgage Investment Co. of El Paso, 292 S.W.2d 636, 638 (Tex.Civ. App.El Paso 1955, writ ref'd n.r.e.), aff'd, 157 Tex. 572, 305 S.W.2d 280, 282 (1957), the court held that `he who holds a first lien and subordinates same to a third lien makes his lien inferior or subordinate to both second and third liens. Shaddix v. National Surety Co., 221 Ala. 268, 128 So. 220 (1930).' This holding applies precisely to the situation before the court in this case. The Bank subordinated its first lien to appellant, the third lienholder. The Bank's lien therefore became subordinate to both appellee's second lien and appellant's third lien. Obviously, appellee's lien then became superior to both appellant's lien and the Bank's lien:

"Pre-Subordination Post-Subordination
"(1) Bank (1) Appellee
"(2) Appellee (2) Appellant
"(3) Appellant (3) Bank

"Appellant states in its brief that the Bank transferred its priority right as first lienholder to appellant, allowing it to stand in the shoes of the Bank. We cannot agree with this contention. We find no evidence in the record of a transfer of priority rights. Undoubtedly, the Bank could have transferred its interest to any inferior lienholder. If it had done so, the former inferior lienholder who purchased the Bank's interest would have succeeded to the Bank's superior priority position and stepped into its shoes on the priority ladder. However, that is not what occurred. The Bank merely subordinated its interest to that of appellant. Appellant's interest was not made superior to the interest of any prior lienholder by virtue of the Bank's agreement to subordinate. Only the Bank's position on the priority ladder changed as a result of its subordination."
ITT Diversified Credit v. First City Capital Corp., 717 S.W.2d 419, 421 (Tex.App.1986). Although the Texas Supreme Court reversed the ruling of the Court of Appeals, we hold the language of the Texas Court of Appeals opinion and the reliance on Shaddix therein to be a more compelling argument under the facts of this case. In so holding, we find the result reached by relying in Shaddix to be consistent with the definition of "subordination agreement":
"An agreement by which one holding an otherwise senior lien or other real estate interest consents to a reduction in priority vis-à-vis another person holding an interest in the same real estate. An agreement by which the subordinating party agrees that its interest in real property should have a lower priority than the interest to which it is being subordinated."
Black's Law Dictionary (6th ed.1990). By definition, "subordination" contemplates a reduction in priority. Nothing in the definition contemplates raising a lower priority lienholder up to the position of the subordinating party.[4]
The judgment is reversed and the case is remanded, on the authority of Shaddix v. National Surety Co., 221 Ala. 268, 128 So. 220 (1930).
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, KENNEDY, INGRAM, and BUTTS, JJ., concur.
COOK, J., dissents.
COOK, Justice (dissenting).
I respectfully dissent. I would affirm the judgment of the trial court; I adopt the following reasoning of the Texas Supreme Court in ITT Diversified Credit v. First City Capital Corp., 737 S.W.2d 803 (Tex.1987):
"In a non-real property situation, the third lienholder should be able to succeed to that part of the interest that was subordinated by the first lienholder, so long as the second *699 lienholder is neither burdened nor benefited by the subordination agreement. For example, A, B and C have claims against the debtor which are entitled to priority in alphabetical order. `A' subordinates his claim to `C.' After foreclosure of the secured interest, the resulting fund is insufficient to satisfy all three claims. The proper distribution of the fund is as follows:
"1. Set aside from the fund the amount of [A's] claim.
"2. Out of the money set aside, pay `C' the amount of its claim, pay `A' to the extent of any balance remaining after [C's] claim is satisfied.
"3. Pay `B' the amount of the fund remaining after [A's] claim has been set aside.
"4. If any balance remains in the fund after [A's] claim has been set aside and [B's] claim has been satisfied, distribute the balance to `C' and `A'.
"See Gilmore, Security Interests in Personal Property § 39.1 at 1021 (1965).
"Thus, `C', by virtue of the subordination agreement, is paid first, but only to the amount of [A's] claim, to which `B' was in any event junior. `B' receives what it had expected to receive, the fund less [A's] prior claim. If [A's] claim is smaller than [C's], `C' will collect the balance of its claim, in its own right, only after `B' has been paid in full. `A', the subordinator, receives nothing until `B' and `C' have been paid except to the extent that its claim, entitled to first priority, exceeds the amount of [C's] claim, which, under its agreement, is to be first paid."
737 S.W.2d at 804. Under the facts of this case, AmSouth has neither benefited from, nor been adversely affected by, Presidential's allowing J & D to move into first priority only to the extent of the amount of Presidential's lien. Had there been no agreement between Presidential and J & D, AmSouth would not have been entitled to the funds it now claims. Without question, those funds would have gone to Presidential. The obvious intent of the agreement between Presidential and J & D, in my opinion, was to allow J & D to move into first priority to the extent of Presidential's claim; therefore, I would follow Professor Gilmore's approach as it was stated in the ITT case, quoted above. For the foregoing reasons, I respectfully dissent.
NOTES
[1] According to the appellant, a factoring agreement "is a credit facility where the factor buys the accounts receivable of the customer at a discount, and then makes a profit by collecting the full amount of the receivable directly from the customer's account debtor. This allows the customer to obtain immediate cash flow rather than waiting for the receivables to be paid. Both Presidential and J & D were factors."
[2] The collateral listed on both UCC-1 forms is virtually identical; however, the UCC-1 based on the transaction between SBS and AmSouth shows the debtor as "Sweet Bonnie Sue, Inc.," while the UCC-1 based on the the transaction between SBS and J & D shows the debtor as "Sweet Bonnie Sue, Inc. T/A Lori and Me." "Lori and Me" is a division of SBS.
[3] In its brief on appeal, the appellee accepted the "stipulated facts" as an adequate statement of the facts, but added the following: "Additionally, J & D would show ... that Presidential Financial Corporation obtained a judgment against [SBS] on October 8, 1992, in the amount of $80,694.65..., no part of which has been paid."
[4] We note that there was no assignment or subrogation agreement in this case. Had there been, the resulting order of priority would have been different.