In the
# United States Court of Appeals
### For the Seventh Circuit

No. 12-2854

CATERPILLAR FINANCIAL SERVICES CORPORATION,

*Plaintiff-Appellee,*

*v.*

PEOPLES NATIONAL BANK, N.A.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:10-cv-00298-GPM-DGW—**G. Patrick Murphy**, *Judge.*

ARGUED JANUARY 23, 2013—DECIDED MARCH 4, 2013

Before POSNER and WILLIAMS, *Circuit Judges*, and
NORGLE, *District Judge*.[*]

POSNER, *Circuit Judge*. This diversity suit governed
by Illinois law pits the financing arm of Caterpillar, the
well-known manufacturer of tractors and a variety of
other industrial equipment (and much else besides),

---

[*] Hon. Charles R. Norgle of the Northern District of Illinois,
sitting by designation.

against Peoples National Bank, which operates in southern Illinois and eastern Missouri. Caterpillar accuses the bank of having converted the proceeds of sales of collateral to which Caterpillar had a secured claim superior to the bank's secured claim. After a bench trial the district judge granted judgment for Caterpillar and awarded it damages of $2.4 million plus prejudgment interest of a shade less than 2 percent per annum. The bank's appeal presents a variety of issues of secured-transactions law.

In 2006 a coal-mining company in southern Illinois named S Coal borrowed some $7 million from Caterpillar secured by the coal company's mining equipment. The company was also indebted to Peabody Energy Corporation, for an earlier loan, and at Peabody's request S Coal transferred title to the same equipment, subject to Caterpillar's security interest in it, to an affiliate of Peabody. The affiliate was a "special purpose" entity. Its raison d'être was by holding the title to the equipment to try to keep the equipment from being seized by creditors (other than Peabody) of S Coal, which was known to be in a parlous financial state.

Two years later, in 2008, Peoples National Bank lent S Coal $1.8 million secured by the same mining equipment that secured Caterpillar's loan. (So the same equipment was now collateral for loans from Peabody, Caterpillar, and the bank.) The bank filed a financing statement covering this collateral. In its pre-loan investigation the bank discovered an earlier, recorded financing statement which said that S Coal had given Peabody a

security interest in all of the coal company's assets. The bank wanted its security interest to have priority over Peabody's. It therefore negotiated an agreement with Peabody subordinating the latter's claim to the bank's claim. But the bank did not obtain a copy of a security agreement between S Coal and Peabody for Peabody's loan to S Coal—and a security interest is not enforceable unless "the debtor has authenticated a security agreement that provides a description of the collateral." UCC § 9-203(b)(3)(A).

S Coal defaulted on its various loans, and the bank and Caterpillar found themselves fighting over the same pool of assets—S Coal's mining equipment—that secured their loans. The bank managed to obtain possession of the assets and told Caterpillar it would try to sell them for $2.5 million. Caterpillar did not object. But it reserved the right to sue the bank unless the bank handed over the proceeds of the sale to Caterpillar; for Caterpillar claimed that its security interest was senior to the bank's. The bank sold S Coal's equipment for $2.5 million but kept back $1.4 million to cover what the coal company owed it. It sent a check for the remaining $1.1 million to Caterpillar. Caterpillar neither cashed the check nor returned it to the bank.

When two or more secured creditors claim conflicting security interests in the same collateral, the creditor who filed his financing statement earlier normally has the senior claim. UCC § 9-322(a)(1). (Illinois law governs because S Coal, the debtor, is located there, see UCC § 9-301(1), but the relevant provisions of the Illinois com-

mercial code are identical to those of the Uniform Commercial Code, so we won't bother to cite the Illinois code.) Caterpillar's financing statement dates to 2006, two years before the bank filed its own financing statement covering the same equipment. The bank's claim of priority over Caterpillar derives from its dealings with Peabody, for remember that S Coal's indebtedness to Peabody preceded Caterpillar's 2006 loan. The bank argues that in connection with that indebtedness Peabody had obtained a security interest in all of S Coal's assets, that the security interest had been perfected by a financing statement signed in 2005, and therefore that Peabody had priority over Caterpillar's security interest in the same equipment. The bank further and critically argues that Peabody transferred its secured interest in the equipment (a secured interest senior to Caterpillar's) to the bank in 2008 by agreeing to subordinate the loans it had made to S Coal to the bank's loans, enabling the bank to step into Peabody's shoes and obtain priority over Caterpillar.

Had it not been for the subordination agreement, Peabody's claim to a security interest in S Coal's assets would have had first priority by virtue of the 2005 financing statement, Caterpillar second priority by virtue of its 2006 financing statement, and the bank third priority by virtue of its 2008 financing statement. Courts disagree on how a subordination agreement affects priorities if the agreement does not say. Some cases, opting for what is called "complete subordination," drop the subordinating creditor to the bottom of the priority ladder. See, e.g., *AmSouth Bank, N.A. v. J & D*

*Financial Corp.*, 679 So.2d 695 (Ala. 1996) (per curiam). That would make the order of priority in this case Caterpillar, bank, Peabody. But that would benefit a nonparty to the subordination agreement (Caterpillar)—and why would the parties to the subordination agreement, who did not include Caterpillar, want to do that?

The majority approach to subordination agreements, which goes by the name "partial subordination," simply swaps the priorities of the parties to the subordination agreement—a swap that would make the order in this case the bank, Caterpillar, Peabody—thus leaving nonparties unaffected by it. See, e.g., *In re Batterton*, No. 00-80181, 2001 WL 34076431 (Bankr. C.D. Ill. Apr. 5, 2001) (Illinois law); *Duraflex Sales & Service Corp. v. W.H.E. Mechanical Contractors*, 110 F.3d 927, 935 (2d Cir. 1997); *ITT Diversified Credit Corp. v. First City Capital Corp.*, 737 S.W.2d 803, 804 (Tex. 1987); 2 Grant Gilmore, *Security Interests in Personal Property* § 39.1, pp. 1020-21 (1965); George A. Nation III, "Circuitry of Liens Arising from Subordination Agreements: Comforting Unanimity No More," 83 *B.U. L. Rev.* 591, 597-603 (2003); 1 Barkley Clark & Barbara Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 3.10[2], p. 3-76 (3d ed. 2012). The bank would prefer "partial subordination" because that would put it ahead of Caterpillar, and we can't think why Peabody would have insisted on complete subordination, had it been consulted on the matter. It wanted the bank's loan to go through, as that would bolster S Coal, which was Peabody's debtor. And in either case—whether subordination was partial or complete—Peabody would be in last place.

Caterpillar was not consulted about whether subordination of Peabody to the bank would be partial or complete. It didn't have to be. Under complete subordination, it would benefit; the priority of its security interest would rise from second to first. Under partial subordination, no matter how large the bank's loan Caterpillar's security interest would be unaffected. The "partial" in "partial subordination" denotes the fact that the parties to a subordination agreement swap places in the priority ladder only to the extent of the smaller of the swapping parties' loans. If, for example, Peabody had been owed $1 million by S Coal, the subordination agreement would have given the bank first priority only with respect to the first $1 million of the bank's $1.8 million loan. The order of priority would then be bank ($1 million), Caterpillar ($7 million), bank ($.8 million), Peabody ($1 million). The amount subordinated is limited to the amount that the creditor having priority over the nonparty was owed before he swapped places with a junior creditor. In the real as distinct from the hypothetical case, S Coal owed Peabody at least $4 million, which was much more than the bank's loan, and so the bank was able to move into first place for its entire loan without hurting Caterpillar.

But this conclusion reckons without Caterpillar's argument that the security interest it acquired in S Coal's equipment in 2006 was a purchase money security interest: "an obligation . . . incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." UCC § 9-103(a)(2). Such

a security interest enjoys priority even over earlier security interests in the same property, UCC § 9-324(a); 4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 33-4, pp. 330-40 (6th ed. 2010), such as Peabody's, and therefore over the priority of the bank as Peabody's successor. A purchase money security interest does not encumber existing property of the debtor, but new property. New property increases the debtor's assets and so reduces rather than increases the risk that the debtor will default on its earlier debts. *In re Howard*, 597 F.3d 852, 857 (7th Cir. 2010). So the earlier creditors are not harmed by the latecomer's obtaining priority over them in the new property.

The argument fails in this case because the equipment of S Coal that Caterpillar financed in 2006 was not newly purchased equipment. S Coal had obtained it by leases that entitled the coal company to purchase the equipment for a nominal sum after completing specified payments. Thus the "lessors," though nominally owners, were actually lenders. Caterpillar's loan enabled S Coal to complete the payments and thus obtain title. The loan just replaced the financial lease. The UCC treats the two types of financing as equivalents. UCC § 1-203(b)(4); cf. *Public Hospital of Town of Salem v. Shalala*, 83 F.3d 175, 178 (7th Cir. 1996).

It's true that before the refinancing of the lessors' loans by Caterpillar, the lessors had a purchase money security interest because the leases had enabled S Coal to acquire the equipment; "a purchase-money security interest does not lose its status as such, even if. . .the purchase-money obligation has been . . . refinanced." UCC

§ 9-103(f)(3). But the lessors did not refinance their loans. A new lender—Caterpillar—came along and replaced the lessors, and in such a situation the new lender can preserve his predecessor's priority only by obtaining an assignment of the predecessor's security interest. *Lewiston State Bank v. Greenline Equipment, L.L.C.*, 147 P.3d 951, 955 (Utah App. 2006); see also UCC § 9-310(c); *In re Trejos*, 374 B.R. 210, 215-16 (9th Cir. B.A.P. 2007). Otherwise other creditors might not realize that the new lender had preserved his predecessor's priority—that another creditor had stepped into that previous creditor's shoes. Without an assignment the previous creditor's loan would appear to have been repaid and his security interest therefore extinguished. Caterpillar didn't obtain an assignment of the lessors' purchase money security interest, so it didn't inherit as it were the priority of that security interest.

Another losing argument by Caterpillar relates to the special purpose entity that Peabody formed to hold title to its collateral, that is, to S Coal's assets. Caterpillar argues that the bank could not have obtained a security interest in those assets because they no longer belonged to S Coal but instead to the special purpose entity. But the location of title is not determinative of the power to create a security interest. Title to S Coal's assets was, as we said, transferred to Peabody's special purpose entity only in order to shield the assets from creditors of S Coal, other than Peabody itself. The transfer of title was temporary, until S Coal repaid Peabody. And the assets themselves, as distinct from title to them, were not transferred: S Coal needed

them, and continued to use them, to operate its coal-mining business; the special purpose entity was forbidden to use, transfer, or encumber them unless S Coal defaulted. And neither the creation of the special purpose entity nor the transfer to it of title to S Coal's assets was disclosed publicly. "'[W]here the true owner of the property allows another to appear as the owner of or to have full power to dispose of the property, so [that] a third party is led into dealing with the apparent owner, the true owner will be estopped from asserting that the apparent owner did not have the title," and therefore the apparent owner will be treated as having "rights in the collateral," thus enabling him to create security interests in it. *In re Pubs, Inc.,* 618 F.2d 432, 439 (7th Cir. 1980) (Illinois law); see also *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.,* 649 N.E.2d 511, 516 (Ill. App. 1995); *In re Standard Foundry Products, Inc.,* 206 B.R. 475, 479 (Bankr. N.D. Ill. 1997).

So far we have seen Caterpillar's arguments for priority over the bank falling like ninepins. But the bank's argument for priority encounters a greater obstacle—in fact an insurmountable one.

If Peabody had a security agreement with S Coal, it hasn't surfaced in this litigation. Peabody did not produce any such agreement in response to the bank's subpoena, and the bank dropped the matter; for example it made no effort to obtain a copy from S Coal. It is of course possible, and in fact very likely, that Peabody had such an agreement with S Coal; its financing statement says so. But remember that a

security interest is not enforceable unless "the debtor has authenticated a security agreement that provides a description of the collateral." UCC § 9-203(b)(3)(A). The bank can't prove that S Coal, the debtor, did that for Peabody. And even if there was a security agreement, we can't assume that the collateral it described, if it did describe collateral, included the specific equipment that the bank took possession of in 2009 to satisfy its loan.

The bank invokes a "composite document theory" as authority for substituting for the missing security agreement two other documents: the financing statement that recites the existence of such an agreement, and the subordination agreement. The bank derives the composite document theory from *In re Numeric Corp.*, 485 F.2d 1328, 1331 (1st Cir. 1973), which has been followed in Illinois and elsewhere. See *Turk v. Wright & Babcock, Ltd.*, 528 N.E.2d 993, 994-95 (Ill. App. 1988); *Helms v. Certified Packaging Corp.*, 551 F.3d 675, 681-82 (7th Cir. 2008) (Illinois law); *In re Bollinger Corp.*, 614 F.2d 924, 927 (3d Cir. 1980). We have no quarrel with the theory, or with its application in *Numeric*. A financing statement contained a description of collateral, and although there was no separate security agreement a resolution of the debtor's board of directors stated that the debtor was conveying a security interest in the assets described in the financing statement. The resolution's authenticity was not in question and the court held that the two documents—the financing statement and the resolution—between them satisfied the two purposes of section 9-203(b): to provide an exact description of the collateral and "to serve as a Statute of Frauds, preventing

the enforcement of claims based on wholly oral repre-sentations." 485 F.2d at 1331.

The composite proposed by Peoples National Bank comports with neither purpose. The financing statement subjects "all equipment" of S Coal to the security agree-ment but leaves unclear whether the description in the missing security agreement was as general, or whether instead it itemized equipment in which Peabody was acquiring a security interest. There was only one descrip-tion in *Numeric*—the one in the financing statement. If there were two descriptions in the present case, the one in the missing security agreement is controlling. For as we have twice pointed out, a security interest is en-forceable only if the debtor has authenticated a security agreement that provides a description of the collateral. The financing statement does not create the security interest. It only places other creditors on notice of it. If Peabody's financing statement lists any equipment not specified in the security agreement, Pea-body had no security interest in that equipment that it could subordinate to the bank's security interest, thus enlarging the bank's interest.

As for the Statute of Frauds function of requiring a written security agreement, also emphasized in *Numeric*, nothing in our case corresponds to the directors' resolu-tion in that case. Remember that the required signature (or a directors' resolution conceded to be an authentic verification of the company's execution of an agreement to vest a creditor with a security interest) is that of the debtor, in this case S Coal. There is no signature,

directors' resolution, or equivalent indication of S Coal's decision to convey a security interest to Peabody—or rather no *contemporaneous* indication. The subordination agreement itself, signed by S Coal, states that Peabody has a security interest in S Coal's assets. But signed as it was three years after Peabody's loan to S Coal, it indicates only that S Coal believed that it had created a security interest at that earlier time.

So because of the missing security agreement between S Coal and Peabody, Caterpillar's security interest in the equipment was prior to the bank's, which was derivative from Peabody's. And Caterpillar's security interest, with its priority, continued into the proceeds when the bank sold the equipment. UCC §§ 9-315(a)(2), 9-322(b)(1). Caterpillar refused to cash the bank's check for a portion of those proceeds, fearing that doing so would be construed as a waiver of any objection to the bank's claim to have a superior security interest. UCC § 3-311; *IFC Credit Corp. v. Bulk Petroleum Corp.*, 403 F.3d 869, 873 (7th Cir. 2005) (Illinois law), and *McMahon Food Corp. v. Burger Dairy Co.,* 103 F.3d 1307, 1312-13 (7th Cir. 1996) (ditto). The fear was well founded because written on the check was "Satisfaction of subordinate security interest."

So Caterpillar was out $2.4 million of the $2.5 million sale proceeds (the other $100,000 was for a piece of equipment not covered by Caterpillar's security interest). The bank had no right to those proceeds. It converted them—the counterpart in tort law to theft in the criminal law. The damages awarded Caterpillar were

therefore proper. They would have been lower had the $1.1 million check that the bank sent Caterpillar been a cashier's check rather than, as it was, a personal check. *Wang v. Marcus Brush Co.*, 823 N.E.2d 140, 142 (Ill. App. 2005). For a cashier's check is the equivalent of cash, whereas a personal check is just a promise of payment. The bank did not, by writing the check, give Caterpillar a dime, or give up a dime.

The award to Caterpillar of prejudgment interest (from the date on which having sold the equipment the bank pocketed the proceeds, that being the date on which the tort was committed) was also proper. Illinois law authorizes prejudgment interest when the loss for which the plaintiff is seeking redress is a dollar amount known or easily calculable. *National Union Fire Ins. Co. v. American Motorists Ins. Co.*, Nos. 11-2500, 11-2533, 2013 WL 516283, at *4 (7th Cir. Feb. 13, 2013) (Illinois law); *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 355 (7th Cir. 2010) (ditto). If that condition is satisfied, the debtor can stop the running of interest by depositing with the court the exact amount he'll have to pay if found liable. *Residential Marketing Group, Inc. v. Granite Investment Group*, 933 F.2d 546, 549 (7th Cir. 1991); *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1342 (7th Cir. 1988). For when a party deposits money with the court "the clerk shall deposit that money in an interest bearing account . . . . When a judgment is entered as to the disposition of the principal deposited, the court shall also direct disposition of the interest accrued to the parties as it deems appropriate." 735 ILCS 5/2-1011(a). The deposit thus

ensures that the plaintiff will be compensated for the time value of money should he be found to be owed that money, so that the judgment will "make [the] deprived plaintiff whole." *PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 895 (7th Cir. 2004).

AFFIRMED.