# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**BRIAN R. GATES**
**TIMOTHY W. WOODS**
**J. THOMAS VETNE**
Jones Obenchain, LLP
South Bend, Indiana

ATTORNEY FOR APPELLEE:

**ELIZABETH B. SEARLE**
Ball Eggleston PC
Lafayette, Indiana

FILED

Apr 23 2014, 10:14 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CO-ALLIANCE, LLP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 91A05-1312-PL-607 |
| | ) | |
| MONTICELLO FARM SERVICE, INC., | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE WHITE CIRCUIT COURT
The Honorable Robert W. Thacker, Judge
Cause No. 91C01-1102-PL-10

**April 23, 2014**

**OPINION - FOR PUBLICATION**

**SHEPARD, Senior Judge**

We conclude that Indiana should follow the majority rule on agreements to modify the priority of liens securing interests in a borrower's assets.

Here, the lender in first position agreed to subordinate part of its lien in favor of a third-position lender, in effect a partial assignment that reduced the extent of its first position. Such a contract should neither harm nor help the second-position lender, who was not a party to the agreement.

We think recognizing such agreements is consistent with the Uniform Commercial Code and Indiana common law. We therefore affirm the trial court's decision.

<u>FACTS AND PROCEDURAL HISTORY</u>

Timothy, Lisa, Ross, and Dane Clark and their farming operations pledged their 2010 crops as well as other farm products and equipment as collateral to obtain loans from three different creditors, who perfected their security interests in the following order: First Farmers Bank & Trust, Co-Alliance, LLP, and Monticello Farm Service, Inc. In June 2010, the Bank and Monticello entered into an agreement in which Monticello agreed to finance the Clarks' 2010 crops, and in turn, the Bank agreed to subordinate its interests in those crops to Monticello's interests in the same:

> WHEREAS, Monticello in consideration for certain financial accommodations to Borrower for the purpose of financing their 2010 crop, said financial accommodations including, but not limited to, monies dispersed, or to be dispersed, under a note or open account not to exceed the principal sum of Three Hundred Forty Thousand and 00/100 Dollars ($340,000.00), as well as any extensions, modifications or renewals thereof, has or may acquire a security interest or interests in the Borrower's 2010 crops grown or to be grown (together with any additions or accessions thereto as well as all proceeds and products thereof) and shall perfect said security interest by duly filing a financing statement or statements; and,

2

WHEREAS, the Subordinating Creditor, in order to induce Monticello to make the aforementioned financial accommodations to Borrower, desires and intends to subordinate and postpone the priority, operation and effect of its security interest in Borrower's 2010 crops growing or to be grown even though it, the Subordinating Creditor, has duly filed a financing statement or statements and perfected its security interest therein, and thereby may have priority over the security interests of Monticello in said 2010 crops whether by order of priority or purchase money status.

NOW, THERFORE, parties hereto, agree that all security interests of the Subordinating Creditor in any Borrower's 2010 crops growing or to be grown shall be subordinate, junior and inferior and postponed in priority to the priority, operation and effect of any security interest or interests of Monticello in Borrower's 2010 crops growing or to be grown, regardless of the order of filing or purchase money status.

This Agreement shall be binding on the parties hereto, their heirs, representatives, successors and assigns.

Appellant's App. pp. 204-05.

Timothy and Lisa filed for bankruptcy in November 2010. At that time, the Bank was owed $2,382,000, Co-Alliance was owed $221,000, and Monticello was owed $216,000. In December 2011, the Clarks and the three creditors entered into a settlement agreement in which the Clarks and the Bank waived any claim to $181,000 of the 2010 crop proceeds. The Bank "assign[ed] any interest it may have in those remaining proceeds to Co-Alliance subject to the rights and interests of Monticello pursuant to the Subordination Agreement dated June 25, 2010." *Id.* at 308. For their part, Co-Alliance and Monticello waived any claim to 2010 crop proceeds exceeding $181,000. The Clarks agreed to hold $181,000 in the escrow account of their attorney.

Meanwhile, in February 2011, the Bank sought foreclosure and a money judgment against Ross and Dane in the White Circuit Court. Several other parties, including Co-Alliance and Monticello, were named as defendants due to their interests in the Clarks'

3

property.  Monticello answered and cross-claimed against the other defendants.  After the settlement agreement was filed in the bankruptcy proceedings, Monticello obtained leave to amend its cross-claim to join Timothy and Lisa, who had signed certain promissory notes alongside Ross and Dane, so that Monticello could claim the $181,000 available from the 2010 crop proceeds.

Co-Alliance counterclaimed against Monticello, asserting that it held the first priority lien on the $181,000 and further alleging that Monticello converted a number of checks by depositing them without the necessary endorsements.  On Co-Alliance's motion, the trial court directed the $181,000 to be transferred to the trial court clerk.

Monticello and Co-Alliance each moved for partial summary judgment, and the court held a hearing.  In October 2012, the court found that Monticello was entitled to the disputed funds, granted Monticello's motion, denied Co-Alliance's motion, and directed the trial court clerk to continue to hold the $181,000 until further order.

Co-Alliance appealed, but because the trial court's order was not a final judgment or an interlocutory order appealable as of right, we dismissed.  *See Co-Alliance, LLP v. Monticello Farm Serv., Inc.*, No. 91A04-1211-PL-606 (Ind. Ct. App. July 22, 2013).  Several months later in November 2013, the parties jointly asked the trial court to revise its order into a final appealable order, and it did so.  The parties then jointly asked the court to order disbursement, which it also did.  Co-Alliance now appeals.

## ISSUE

The sole issue is whether the trial court properly determined that the subordination agreement gave Monticello first claim on the remaining $181,000 in 2010 crop proceeds.

4

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Perdue v. Gargano*, 964 N.E.2d 825, 831 (Ind. 2012). All facts established by the designated evidence and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Perdue*, 964 N.E.2d at 831.

Subordination agreements are nothing more than contractual modifications of lien priorities. *ITT Diversified Credit Corp. v. First City Capital Corp.*, 737 S.W.2d 803, 804 (Tex. 1987). They can be used to accelerate the flow of cash to troubled projects, providing financial relief that promotes the development of assets that are then used to secure payments to all lienholders. *Duraflex Sales & Serv. Corp. v. W.H.E. Mech. Contractors*, 110 F.3d 927, 936 (2d Cir. 1997). Exactly how such agreements modify lien priorities is the question presented in this appeal.

It is undisputed that but for the subordination agreement, the Bank would have had first claim to the 2010 crops, followed by Co-Alliance, and then Monticello. Co-Alliance argues that because "subordinate" means to move a right or claim to a lower rank, the subordination agreement completely reduced the Bank's security interest in the 2010 crops such that the Bank dropped to the end of the line. Monticello disagrees, arguing the agreement merely allowed it to momentarily step into the Bank's first priority status.

Co-Alliance's approach to subordination agreements, called "complete subordination," has been adopted by some courts. *See AmSouth Bank, N.A. v. J & D Fin. Corp.*, 679 So. 2d 695 (Ala. 1996); *Old Stone Mortg. & Realty Trust v. New Ga.*

5

*Plumbing, Inc.*, 236 S.E.2d 592 (Ga. 1977); *Blickenstaff v. Clegg*, 97 P.3d 439 (Idaho 2004). In *AmSouth Bank*, for example, the Alabama Supreme Court held that the first lienholder's subordination agreement with the third lienholder "subordinated its first lien to . . . the third lienholder. The Bank's lien therefore became subordinate to both [the] second lien and [the] third lien." 679 So. 2d at 698. This holding, the court noted, was consistent with the definition of "subordination," which contemplates a reduction in priority and could not involve raising a lower priority lienholder up to the position of the subordinating party. *Id.*

We perceive this approach, held by some respectable authorities, to be the minority position in the field—and one that conflicts with a bedrock principle in Indiana law that the intent of the parties controls the contract. *See City of Jeffersonville v. Envtl. Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011) ("In Indiana, the interpretation of a contract is controlled by the intent of the parties as expressed by the clear language of the contract.").

In the subordination agreement here, the Bank and Monticello agreed that the Bank was "subordinat[ing]" and "postpon[ing]" the priority of its security interest in the Clarks' 2010 crops to the priority of Monticello's security interest in those same crops "in order to induce Monticello to make" "certain financial accommodations to [the Clarks] for the purpose of financing their 2010 crop." Appellant's App. pp. 204-05.

The clear language of the subordination agreement shows that the parties' intent was for the Bank to assign to Monticello a portion of any 2010 crop proceeds received by the Bank based on its status as the first lienholder. How else could the Bank have

6

induced Monticello to make a loan but to guarantee it the right of first payment?  Under these circumstances, treating a subordination of an interest differently from an assignment of that interest would add confusion to the law, not clarity, and would allow an intervening lienholder to obtain a windfall by becoming a senior lienholder through no action of his own.  Put another way, the agreement in this case is the functional and legal equivalent of a partial assignment.[1]

And in fact, such "partial subordination" is the majority approach to subordination agreements.  *Caterpillar Fin. Servs. Corp. v. Peoples Nat'l Bank, N.A.*, 710 F.3d 691, 693-94 (7th Cir. 2013); *see, e.g.*, *Duraflex Sales & Serv. Corp. v. W.H.E. Mech. Contractors*, 110 F.3d 927 (2d Cir. 1997); *In re Cliff's Ridge Skiing Corp.*, 123 B.R. 753 (Bankr. W.D. Mich. 1991); *In re Price Waterhouse Ltd.*, 46 P.3d 408 (Ariz. 2002); *ITT Diversified Credit Corp. v. First City Capital Corp.*, 737 S.W.2d 803 (Tex. 1987).  The court in *ITT Diversified Credit* described partial subordination in this way:

> A, B and C have claims against the debtor which are entitled to priority in alphabetical order.  "A" subordinates his claim to "C."  After foreclosure of the secured interest, the resulting fund is insufficient to satisfy all three claims.  The proper distribution of the fund is as follows.
>   1. Set aside from the fund the amount of "A"'s claim.
>   2. Out of the money set aside, pay "C" the amount of its claim, pay "A" to the extent of any balance remaining after "C"'s claim is satisfied.
>   3. Pay "B" the amount of the fund remaining after "A"'s claim has been set aside.
>   4. If any balance remains in the fund after "A"'s claim has been set aside and "B"'s claim has been satisfied, distribute the balance to "C" and "A."

---

[1] Moreover, as the Bank lowered its priority up to a certain amount in favor of Monticello, even a rigid definition of "subordinate" is appropriate here.  The partial subordination says nothing about the Bank's position vis-à-vis Co-Alliance, who was not even a party to the subordination agreement.

7

Thus, "C," by virtue of the subordination agreement, is paid first, but only to the amount of "A"'s claim, to which "B" was in any event junior. "B" receives what it had expected to receive, the fund less "A"'s prior claim. If "A"'s claim is smaller than "C"'s, "C" will collect the balance of its claim, in its own right, only after "B" has been paid in full. "A," the subordinator, receives nothing until "B" and "C" have been paid except to the extent that its claim, entitled to first priority, exceeds the amount of "C"'s claim, which, under its agreement, is to be first paid.

737 S.W.2d at 804 (citation omitted). As clarified by the court, "the third lienholder should be able to succeed to that part of the interest that was subordinated by the first lienholder, so long as the second lienholder is neither burdened nor benefitted by the subordination agreement." *Id.*

We embrace this approach, rather than the minority position that says any such agreement between "A" and "C" moves "A" to the back of the line as respects the full extent of its security. Co-Alliance was not a party to the subordination agreement, gave no consideration, and should not be entitled to a windfall. Moreover, the Bank and Monticello clearly did not intend to make Co-Alliance a third-party beneficiary of their subordination agreement.

We instead adopt the majority rule, which allows for partial subordination of the first lienholder's interest. The Bank could induce Monticello to finance the Clarks' 2010 crops by giving Monticello its right to first payment. By virtue of the subordination agreement, Monticello would be paid first, but only up to the amount of the Bank's senior claim, to which Co-Alliance was in any event junior. Co-Alliance would still receive what it expected to receive had there been no subordination agreement.

8

Even under the partial subordination rule, though, Co-Alliance argues summary judgment was still improper because Monticello failed to show that Co-Alliance was not burdened by the subordination agreement. Specifically, Co-Alliance claims that if the Bank was oversecured, partial subordination could reduce the amount ultimately collected by Co-Alliance. It provides the following scenario in its brief:

| LIABILITIES | | ASSETS | |
|---|---|---|---|
| The Bank | $2,500,000 | Real Estate | $2,000,000 |
| Co-Alliance | $250,000 | Equipment | $250,000 |
| Monticello | $340,000 | Inventory | $100,000 |
| Total: | $3,090,000 | Accounts | $50,000 |
| | | Hogs | $100,000 |
| | | Crops | $340,000 |
| | | Total: | $2,840,000 |

Had there been no subordination agreement, the Bank would take $2,500,000, Co-Alliance would take $250,000, and Monticello would take the remaining $90,000.

Co-Alliance claims that with the subordination agreement, using the partial subordination rule, Monticello would be the first to collect, taking the $340,000 in 2010 crop proceeds for which it stepped into the Bank's first priority status. Co-Alliance then claims that since the remaining assets amount to $2,500,000 and the Bank still holds a first priority security interest in those remaining assets (it had only subordinated its priority as to the 2010 crops), the Bank would take the remaining $2,500,000 and Co-Alliance would be left with nothing.

But partial subordination cannot work that way, consistent with the Uniform Commercial Code or the common law rule, "priority in time gives a lien priority in right." *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010).

9

Instead, the first step is to set aside from the total assets the amount of the Bank's claim, $2,500,000. Out of that $2,500,000, Monticello is paid $340,000 in 2010 crop proceeds, and the Bank is then paid the remaining $2,160,000. At this point, Monticello has been paid off, Co-Alliance is still owed $250,000, the Bank is still owed $340,000, and there are $340,000 left in assets. From the $340,000 left in assets, Co-Alliance is paid the amount of its claim, $250,000. The Bank then collects the remaining $90,000.

The undisputed designated evidence shows that the $181,000 in 2010 crop proceeds does not exceed either the amount of the Bank's first lien or the amount the Bank subordinated to Monticello. There is no evidence that Co-Alliance was burdened by or that it benefitted from the subordination agreement. Rather, as the second-priority creditor, Co-Alliance was unaffected.

Co-Alliance also argues summary judgment was improper because even if the subordination agreement gave Monticello a superior right to the 2010 crop proceeds, it was only entitled to collect $148,000. Specifically, Co-Alliance says Monticello gave the Clarks $308,000 in 2010 crop inputs, and Monticello had already received payments amounting to $160,000.

The subordination agreement, though, does not limit Monticello's senior priority to the $308,000 for crop inputs. Instead, the agreement clearly states that "all security interests of the Subordinating Creditor in any Borrower's 2010 crops growing or to be grown shall be subordinate, junior and inferior and postponed in priority to the priority, operation and effect of any security interest or interests of Monticello in Borrower's 2010 crops growing or to be grown." Appellant's App. p. 205. The designated evidence

shows that the 2010 crops secured not only the credit Monticello extended to the Clarks to fund the 2010 crops but also a $200,000 line of credit the Clarks obtained from Monticello in 2009. *Id.* at 189-96. Co-Alliance does not dispute that the designated evidence shows the Clarks still owed Monticello $44,000 on their 2009 credit line. Appellant's Br. p. 23; Appellant's App. p. 447.

The trial court properly found that the subordination agreement gave Monticello first priority in the remaining $181,000 in 2010 crop proceeds. It therefore correctly granted Monticello's motion for partial summary judgment and denied Co-Alliance's.

## CONCLUSION

We therefore affirm.

NAJAM, J., and KIRSCH, J., concur.